This is an action for divorce brought by petitioner against the defendant on the ground of adultery. It is the second suit I have heard between these parties, the first one being brought by the petitioner against the defendant on the ground of extreme cruelty. After hearing this case I denied the divorce. My opinion will be found in 103 N.J. Eq. 304. In the instant case there were several definite acts of adultery with Helen Wood on specific dates charged by the petitioner. These charges were unwarranted, but were permitted to stand until the hearing, despite the fact that the petitioner knew at the time of the alimony application that if there was a co-respondent it was Helen Wood's sister.
I place little, if any, reliance upon the testimony of the petitioner and her witness. They go much too far. It is inconceivable to me that some of the acts alleged to have been observed by the petitioner and her witnesses could have occurred. And, according to the theory of the petitioner, the *Page 5 
defendant and co-respondent at all times, when it is claimed petting and actual sexual intercourse was observed by them in a car parked in the street, had unlimited access to an apartment in an apartment house near the place in the street where the alleged acts were observed. At least two witnesses, the petitioner and her aunt, Mary Stewart, would have the court believe that they saw a car on December 29th containing the defendant, the co-respondent and another couple at the apartment at Gates avenue and Union street, Montclair, New Jersey, and all sat there and talked for a few moments, and the men appeared to be getting ready to go home when the co-respondent called the defendant back and the other man went on home and the other girl went upstairs and defendant and co-respondent sat in the automobile for awhile and then drove to a lunch wagon and the respondent went to the lunch wagon and came out with some dishes and re-entered the car and petted for a while and then went back to the car and sat there for a while, first on the front seat and then on the back seat, and that petitioner and her aunt walked down to the car and turned around and passed it and saw the defendant lying on the back seat of the car with his head in the corner and the co-respondent on top of him, and that they went to get a policeman and when they got back with the officer the respondent and the co-respondent had driven to the apartment house and went into that house and the light went out and the respondent was in the apartment until two-thirty or three o'clock in the morning, and then came out and got in his car and drove home (pages 125, 126).
Petitioner testified that on the night of December 17th, when she was accompanied by Schmidt, one of her investigators, which was the first time that they had "been able to catch him" (the respondent) (page 40) they saw the defendant drive up to the apartment house, park his car and go in and come out with the co-respondent and park the car on Union street, which is at the side of the apartment, and then go off. Petitioner and the detective attempted to follow but lost respondent and the co-respondent, and went back to the apartment and waited until twelve o'clock, when respondent *Page 6 
and co-respondent came back and parked opposite the apartment house entrance but quite a distance down, in a dark place, and sat for awhile in the front seat with the co-respondent's head over on the shoulder of the respondent, and then got in the back seat, when they disappeared from the vision of the petitioner and her investigator, who were looking through the back window; whereupon petitioner and her investigator got out of the car and walked past the car and then back and respondent "was lying down on the seat of the car, and she lying on top of him, and she had her hat off, and we went back to the car and I guess I started to cry * * *." A police officer appeared about an hour and a half after respondent and co-respondent had parked opposite the apartment house and approached them and asked what they were "hanging around for," and then the police officer "gets in this car and he goes around the block and he comes back, and he was gone about five minutes or so, I guess, before he got back to the place where Dr. McElnea was, and in the meantime they had gotten out of the back seat and went in the front seat and I guess they were getting ready to go up in the apartment" (page 43). She said that the police officer put his search light on them and then went back of their car. She said that the co-respondent and the respondent left their car and went into the apartment house (page 44) and into a room into which they could see when the lights went on.
The testimony of the police officer, Angelotti, and the investigator, Schmidt, is very unsatisfactory.
With respect to the incident of December 17th, respondent produced several witnesses to establish an alibi. It is true that the testimony may be subject to criticism because it comes from relatives, and the manner in which the date, December 17th, is fixed by the witnesses may be open to question. The incident of December 29th is explained by defendant and his witnesses innocently.
The testimony of petitioner's witnesses as to kissing and hugging is met by absolute denials. In the light of the admitted conduct of respondent and co-respondent and of the *Page 7 
testimony of co-respondent's sister, particularly her cross-examination (pages 193, 200, 203): "Did you tell her that you had loaned your apartment to Dr. McElnea and another woman? A. Why should I say that — I loaned the apartment? Q. Never mind why you should; did you say you had given the use of the apartment to Dr. McElnea and another woman? A. I may have said that. * * * A. That I loaned the apartment? Q. That Dr. McElnea and the other lady had the use of the apartment? A. They always had the use of the apartment. Q. Did they, on the occasion when your mother and father were away, during the fall, or winter, of 1928, have the use of the apartment? A. Oh, yes.Q. And when was it that your mother and father were away? A. Dorothy and Dr. Bill were in the apartment in December, 1928, when my mother and father were away." I could credit the testimony of the petitioner and her witnesses if I could bring my mind to believe the remarkable coincidence that on two separate occasions, within a space of two weeks, precisely the same thing should have been observed in a car parked in an open street in precisely the same way, by the petitioner and one person upon one occasion, and by the petitioner and another upon another occasion, i.e., that they saw the car parked, saw the co-respondent and the respondent first in the front seat and then in the back seat, whereupon they disappeared from the vision of the petitioner and her witness, and then petitioner and her witness passed the car both ways and saw the doctor lying on the back seat with the co-respondent on top of him. In the first place, there is the coincidence of the two occasions precisely alike. In the second place, on neither occasion were the co-respondent and the respondent disturbed by the petitioner and her witness passing the car both ways, close enough to look in. In the next place, on neither occasion did the petitioner raise a disturbance. In the next place, it seems incredible that the act of sexual intercourse would be committed in this public place, adjacent to an apartment, a room in which the co-respondent and respondent had the use, and to which, according to petitioner and her witnesses, after the act of *Page 8 
sexual intercourse committed on the back seat of an automobile, they repaired presumptively for the purpose of again having sexual intercourse, for it is said with respect to at least one occasion that the lights went on and off.
The respondent had had difficulty with his wife before. There was this previous suit in which the wife had been defeated. He knew his wife was watching him, and yet it is said that he selected the public places to commit the act of sexual intercourse, with a perfectly safe place adjacent.
Also throwing doubt upon the testimony of the petitioner and her witnesses is her conduct referred to at the outset in first charging Helen Woods, and, indeed, permitting the charge against Helen Woods to remain until the trial, when she knew at the time she signed her affidavit for alimony charging Helen Woods that if there were any co-respondent at all it was not Helen Woods, but her sister.
I think that the petitioner has gone entirely too far "to make a case." That she has gone so far "to make a case" throws doubt upon her whole case.
The respondent and co-respondent may have been guilty of adultery. There is admitted conduct as testified to by themselves and by Helen Woods inconsistent with innocence. I think, perhaps, had petitioner contended herself with evidence which was credible, and we had the evidence of the respondent and co-respondent and Helen Woods, there might be a decree for divorce based upon inclination, desire and opportunity.
But the petitioner has elected to rest her case upon evidence with respect to specific occasions, and, in attempting to support her case, has produced testimony which I think not only to be exaggerated but untrue.
I am forced in this case to the conclusion expressed by Judge Gardner in Sargent v. Sargent, 92 N.J. Eq. 703 (at p. 704): "I vote to affirm the decree below on the ground that thespecific charges of adultery were not proven."
The case would seem to be somewhat analogous to Cartan v.Cartan (Court of Errors and Appeals), 93 N.J. Eq. 175.
The petition will be dismissed. *Page 9